## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT T. HENNION, JR., | CASE NO. 3:13-cv-00268-MWB-GBC |
| Plaintiff, | (JUDGE BRANN) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND FOR FURTHER PROCEEDINGS |
| Defendant. | |
| | Docs. 1, 10, 11, 12, 15 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Robert T. Hennion, Jr., for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff asserts that, *inter alia*, the administrative law judge ("ALJ") improperly rejected two consistent opinions from his treating psychologist and psychiatrist, who had each been treating Plaintiff for more than four years when they wrote their opinions, in favor of an opinion by a state agency physician who never examined Plaintiff. ALJs may reject treating

physician opinions in favor of state agency, non-examining physicians if they sufficiently justify this rejection. Here, the rationales provided by the ALJ for rejecting the opinions, on their face, would provide sufficient justification. However, each rationale provided by the ALJ, under the facts of this case, constituted either an impermissible lay interpretation of medical evidence, a mischaracterization of the record, or both. Consequently, the ALJ failed to provide sufficient justification for rejecting the treating physician opinions.  For the foregoing reasons, the Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter remanded to the Commissioner for further proceedings.

## II.    Procedural Background

On September 29, 2010, Robert T. Hennion, Jr. ("Plaintiff") filed an application for Title II Social Security Disability benefits and also protectively filed a Title XVI application for Supplemental Security Income, alleging disability since June 17, 2010. (Tr. 66). This application was denied, and on January 31, 2012, a hearing was held before an Administrative Law Judge ("ALJ"). Plaintiff was represented by counsel, and a vocational expert testified. On March 9, 2012, the ALJ found that Plaintiff was not disabled and thus not entitled to benefits. (Tr. 77). The decision of the ALJ, which the Appeal's Council declined to review, is the final decision of the Commissioner.

On February 4, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. §§ 405(g); 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits. Doc. 1. On April 3, 2013, Commissioner filed an answer and administrative transcript of proceedings. Docs. 9,10. In May, June, and July 2013, the parties filed briefs in support. Docs. 11,12,15. On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge. On May 19, 2014, Plaintiff notified the Court that the matter is ready for review. Doc. 14.

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence is "less than a preponderance" and requires only "more than a mere scintilla." *Jesurum v.*

*Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.   The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2)

whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

The ALJ's disability determination must also meet certain basic procedural and substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a

clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Id.* at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Com. of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

## V. Relevant Facts in the Record

### A. Medical, school and work records

Plaintiff was born on July 7, 1981 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 85). He has a twelfth grade education and past relevant work as a telephone sales representative. (Tr. 75, 85).

Plaintiff began experiencing problems from mental impairments in school. Plaintiff had been "above average to superior" in elementary school, excelled in spelling bees, and was in good physical health. (Tr. 286).  However, he was diagnosed with attention-deficit hyperactivity disorder ("ADHD") and prescribed medication in eighth grade. (Tr. 286). His education records indicate he "barely made it through the year" with the help of tutors. (Tr. 295). Plaintiff received several failing grades in ninth grade, and appeared to repeat the ninth grade. (Tr.

285). He was referred to a "partial hospitalization" program at Harrisburg Institute of Psychiatry, where he was initially "defiant, non-compliant, and performing poorly," although he completed the program. (Tr. 291, 429-34).

In the tenth grade, Plaintiff was in need of "academic and emotional support to a greater extent than can be provided solely by the regular education program." (Tr. 297). An evaluation indicated that he had a "learning disability and a serious emotional disturbance" and was provided "supplemental intervention in the regular instructional environment" at his "regular school." (Tr. 302). After additional problems, he was assigned to an alternative education program for thirty days outside the regular school building. (Tr. 308-10, 312-13). At a reevaluation, his "difficulties appear[ed] to be related more to emotional and behavioral problems" and he was recommended for an "emotional support program." (Tr. 316). At that point, he was assigned to "full-time Sp. Ed. outside of the regular school" in the "emotional support" instructional group for a full school year. (Tr. 320). He made moderate progress in the "Emotional Support" setting in eleventh grade, but his progress was inconsistent because his motivation fluctuated from week to week. (Tr. 328). He "becomes overwhelmed and will 'shut down.'" (Tr. 328). He "require[d] an highly structured environment [with] a therapeutic component and a low student to teacher ratio 100% of the school day to address his social, emotional, and behavioral needs." (Tr. 335).

At the beginning of twelfth grade, Plaintiff's therapist opined that neither regular school or the alternative school was meeting Plaintiff's needs, and recommended home-schooling. (Tr. 338). His IEP team recommended full-time placement in the home. (Tr. 349). He was suspended multiple times throughout high school in the regular education and alternative education schools. (Tr. 394, 400-03). He graduated in 1999. (Tr. 455).

Plaintiff worked fairly regularly after graduating in June of 1999, although he had gaps of several months between each job. (Tr. 249). In 2004, he began working in telephone sales. (Tr. 250). He would work in this position for six years, until his alleged onset date of June 2010. (Tr. 250). However, he was increasingly absent and unable to comply with office procedures.

In 2008 Plaintiff was treated with imipramine, then Celexa, for "severe" panic attacks. (Tr. 650). When Celexa made him feel like a "zombie," he switched back to imipramine and then added Ativan. (Tr. 652, 656). He initially reported no side effects, but by January of 2009, Plaintiff was reporting to providers at Hershey Medical Center that he had been absent for four days from work with symptoms of nausea, diarrhea, aches, and chills. (Tr. 586, 656).  In February of 2009, Plaintiff reported "some" panic attacks and was prescribed Klonopin[1] as needed. (Tr. 658).

---

[1] *http://www.accessdata.fda.gov/drugsatfda_docs/label/2010/017533s046s048,020813s006s007l bl.pdf* (last accessed January 1, 2015).  "Klonopin is indicated for the treatment of panic disorder…Since Klonopin produces CNS depression, patients receiving this drug should be

In April of 2009, Plaintiff was reporting recent panic attacks, so his Klonopin was increased to 0.75 mg, twice per day. (Tr. 659).

By July of 2009, Klonopin was helping Plaintiff's panic attacks, but he was unable to go to sports events due to agoraphobia. (Tr. 495). Later that month, he missed two days of work. (Tr. 526). Plaintiff continued to have some issues with anxiety, so his Klonopin was increased to 0.5 mg three times a day in September of 2009. (Tr. 497). In November of 2009, Plaintiff reported to a resident the office of Dr. Stephen Sinderman, M.D. (his psychiatrist) that he had anxiety during the day intermittently, including a panic attack during a meeting, and was getting anxious when he got too far from home. (Tr. 498, 664). His mood was stable and "neutral" without irritability. (Tr. 498). He had been "overeating-stress eating lately" but his energy was stable. (Tr. 498). Later that month, he missed a week of work "due to swine flu." (Tr. 535). In December of 2009, Plaintiff had a "bit of a meltdown" with "fluctuations" that went up and down and missed work on two days. (Tr. 539). On January 13, 2010, Plaintiff reported that he had been missing "a lot of work," had to use six or seven vacation days, and that this was the "biggest disaster ever." (Tr. 541). On January 21, 2010, Plaintiff reported that he had been missing

---

cautioned against engaging in hazardous occupations requiring mental alertness, such as operating machinery or driving a motor vehicle…Antiepileptic drugs (AEDs), including Klonopin, increase the risk of suicidal thoughts or behavior in patients taking these drugs for any indication." Side effects of Klonopin also include "[c]onfusion, depression, amnesia, hallucinations, hysteria, increased libido, insomnia, psychosis…excitability, irritability, aggressive behavior, agitation, nervousness, hostility, anxiety, sleep disturbances, nightmares and vivid dreams" along with "constipation, diarrhea… increased appetite [and] nausea."

work and using vacation days and indicated that he needed to "get on a schedule." (Tr. 542).

In February 2010, Plaintiff missed work because he was having a panic attack. (Tr. 545). He later reported problems with work and panic in open spaces. (Tr. 500). Plaintiff missed work again later that month. (Tr. 548). In March 2010, Plaintiff reported increased stress at work. (Tr. 550). He indicated that he had been going on spending binges and wanted to reprogram his mind to lessen his panic attacks. (Tr. 550). On March 31, 2010, Plaintiff reported that he had gone to work for eight days in a row, which was a "record" for the past year or more. (Tr. 551).

On April 27, 2010, Plaintiff was seen at the Hershey Medical Center for right wrist pain. (Tr. 587). He explained that two weeks earlier, he injured his wrist playing hockey. (Tr. 587). He also indicated that he played guitar semi-professionally and typed at his job in sales. (Tr. 587). He weighed 250 pounds. (Tr. 587). However, on May 7, 2010, Plaintiff reported panic attacks. (Tr. 554). He was exercising with "some regularity" for the past ten days, but had episodes where "time stops" and he "can't breathe." (Tr. 554).

On June 1, 2010, Plaintiff followed-up with Dr. Sinderman. (Tr. 503). He was "OK" and reported "some stress." (Tr. 503). He reported feeling physically ill from anxiety and had a panic attack with nausea, vomiting, and diarrhea. (Tr. 503). He was still taking Klonopin three times per day and reported no medication side

effects. (Tr. 503). His appearance was neat, his behavior was appropriate, his mood was "OK," his insight and judgment were intact, and his attention and concentration were good. (Tr. 503). Dr. Sinderman prescribed a trial of Lexapro.[2] (Tr. 503). He was assessed a global assessment of functioning ("GAF")[3] of 60. (Tr. 503).

On June 2, 2010, Plaintiff followed-up with Dr. Rogers, his psychologist. (Tr. 557). He indicated that he was on new medications and had not been back to work yet. (Tr. 557). He had had a panic attack. (Tr. 558). On June 9, 2010, Plaintiff reported that "outside of work [his] life is 'OK.'" (Tr. 559). He indicated the "panic attacks have permanently stained [his] mind." (Tr. 559).

---

[2] *http://www.accessdata.fda.gov/drugsatfda_docs/label/2011/021323s035,021365s025lbl.pdf* (last accessed January 1, 2015). Lexapro is a selective serotonin reuptake inhibitor (SSRI) used to treat generalized anxiety disorder. Side effects include "[i]ncreased risk of suicidal thinking and behavior in…young adults." The "[m]ost commonly observed adverse reactions (incidence ≥5% and at least twice the incidence of placebo patients) are: insomnia, ejaculation disorder (primarily ejaculatory delay), nausea, sweating increased, fatigue and somnolence, decreased libido, and anorgasmia." Id.

[3] "The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994). … The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20…A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. *Id.*" *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014).

Plaintiff stopped working on June 17, 2010. (Tr. 504, 562). He reported "major side effects" from his medications. (Tr. 561). He reported that the medications seemed to have curbed some of his symptoms, but that he felt nauseous and dizzy. (Tr. 561). The next week, he explained he "missed work all week" after having a panic attack the previous Thursday. (Tr. 504). He reported that he did not like people at work. (Tr. 504). His appearance was neat, his behavior was appropriate, his mood was "ok," his affect was broad but anxious, his insight was intact, his judgment was "fair/intact," and his attention and concentration was good. (Tr. 504). He was assessed a GAF of 62. (Tr. 504). His medications were continued, his Lexapro was increased from 5mg per day to 10mg per day, and he was to continue with therapy. (Tr. 504).

On June 30, 2010, he reported to Dr. Rogers that he could not wake up and could not move. (Tr. 562). On July 7, 2010, he indicated that he was depressed and trying to get his "head on straight." (Tr. 563). On July 14, 2010, he indicated that he was distressed from the course of events that had transpired over the past few weeks. (Tr. 563). He was struggling with helplessness and hopelessness. (Tr. 563). Plaintiff indicated he had slept for eleven hours, was up for an hour and a half, and went back to bed. (Tr. 563). He identified circumstantial stressors, like his work situation and some family matters. (Tr. 563). Plaintiff indicated that his medications were working "great" for his panic attacks and that he had been able

to travel to Baltimore the previous Monday without panic symptoms. (Tr. 563). However, he was experiencing some dizziness. (Tr. 563). On July 28, 2010, Plaintiff reported that he had been really productive and creative since being on Lexapro. (Tr. 568). He indicated that he wanted to go to school and move forward with his life. (Tr. 568). However, he referenced the "dilemma" of his side effects. (Tr. 568). He was still struggling to get stable. (Tr. 568).

On July 30, 2010, Plaintiff followed-up with Dr. Sinderman. (Tr. 505, 671). He was taking 10 mg of Lexapro per day and Klonopin 0.5mg three times per day. (Tr. 505). Plaintiff had been off work since June. (Tr. 505). He reported sedation and constipation as a result of Lexapro and had a low stress tolerance, but had been able to run and workout. (Tr. 505). His appearance was neat, his mood was anxious, and his concentration was good. (Tr. 505). He was assessed a GAF of 60-62. (Tr. 505). Dr. Sinderman opined that "given his slow improvement" and symptoms, "he should remain off work for now." (Tr. 505).

On August 6, 2010, Plaintiff followed-up with Dr. Sinderman. (Tr. 506). Plaintiff had decreased his Klonopin to 0.25 mg, but had a panic attack so he returned to 0.5 mg. (Tr. 506). However, he had improved "on Lexapro" and "off work." (Tr. 506). He reported no side effects from medications. (Tr. 506). He was assessed a GAF of 63 and continued on his medications. (Tr. 506). On August 10,

2010, Plaintiff reported that he was still having side effects, that he was handling things "poorly," and was having problems with compulsive spending. (Tr. 569).

On August 20, 2010, Plaintiff followed-up with Dr. Sinderman. (Tr. 507-09). Dr. Sinderman observed that Plaintiff was dressed neatly with clear speech and no evidence of psychosis. (Tr. 508). He indicated he lost his job because he could not provide a specific return date and had been denied short-term disability, but was "holding up fairly well despite this." (Tr. 508). He reported that Plaintiff was moving in with his girlfriend and would walk with her, although he had not jogged since the day before he lost his employment. (Tr. 508). He reported that his anxiety was better on Lexapro and feels "more comfortable in wide-open spaces." (Tr. 508). Dr. Sinderman noted that Plaintiff's Klonopin made him sleep excessively, but that when they reduced the dosage, he had a panic attack. (Tr. 508). He explained that Plaintiff "has had a prolonged period of side effects but never wanted to change his medications as he has found it helpful for his anxiety. He seems to be tolerating it fairly well now and gaining improvement." (Tr. 509). He had "good support, is active with his friends." (Tr. 509). Dr. Sinderman again attempted to decrease Plaintiff's nightly dosage of Klonopin to 0.25 mg to combat his excessive sleeping. (Tr. 507, 509).

On August 24, 2010, Plaintiff reported to Dr. Rogers that he had resumed working out, but discussed the "humiliation" of receiving assistance and indicated

that he was still experiencing lethargy and fatigue. (Tr. 571). On September 3, 2010, Plaintiff indicated that his symptoms were controlled but that he was still experiencing side effects. (Tr. 572). He indicated that he was still sedated but was hesitant to get off Klonopin. (Tr. 572).

On September 10, 2010, Plaintiff followed-up with Dr. Sinderman. (Tr. 510). He was reporting some panic attacks in open areas, more anxiety at times, and a decreased ability to workout. (Tr. 510). He reported no medication side effects. (Tr. 510). He was "living day to day." (Tr. 510). His concentration was good, his insight and judgment were fair, his mood was "OK," his affect was "very restricted," and he was assessed a GAF of 55. (Tr. 510).

On September 22, 2010, Plaintiff followed-up with Dr. Rogers. (Tr. 574). He indicated he had been doing well until his cat, who was "like the love of [his] life," had died. (Tr. 574). However, he had been able to resume workouts and healthy eating. (Tr. 574).

On September 27, 2010, Plaintiff contacted Dr. Sinderman's office. (Tr. 511). He was attempting to receive unemployment, "but apparently he must be employable." (Tr. 511). Plaintiff was requesting a letter stating that he was employable. (Tr. 511). However, given Plaintiff's continued anxiety and sedation, Dr. Sinderman explained that "until he is in fact able to work, such a letter cannot be written." (Tr. 511).

On October 8, 2010, Plaintiff followed-up with Dr. Sinderman's office. (Tr. 512, 675). Plaintiff reported he had a "full blown panic attack" and that things have up and down after he lost his job secondary to his medications. (Tr. 512). He was having problems disassociating with work and indicated his friends at work had turned their backs on him. (Tr. 512). He was having nightmares and waking up after reliving being at work. (Tr. 512). He was reporting fears of being in open space, his appetite had increased, and he was not exercising. (Tr. 512). He indicated that his medications were causing sedation the first two hours of the day. (Tr. 512). Plaintiff had psychomotor retardation, restricted affect, and paranoid delusions. (Tr. 512). His insight and judgment were fair and his attention and concentration were good. (Tr. 512). Plaintiff discussed with Dr. Sinderman "the worst thing that can happen if he has panic attack in public" and indicated that he thought his cat died from a panic attack. (Tr. 513).  He was assessed a GAF of 50. (Tr. 512). He was instructed to increase his therapy sessions with Dr. Rogers to weekly and to take Lexapro at dinner to avoid early morning sedation. (Tr. 512).

On October 21, 2010, Plaintiff reported to Dr. Rogers that had had some panic attacks over the previous two weeks. (Tr. 577). On November 1, 2010, he reported increased depression. (Tr. 729). He also noted that his medications helped with his panic but were adding to his "emotions," like helplessness. (Tr. 579).

On November 6, 2010, Plaintiff followed-up with Dr. Sinderman's office. (Tr. 514). Plaintiff reported that he could not look at the sky for more than twenty minutes. (Tr. 515). He continued to report that his medications were causing a lot of sedation the first few hours after awakening. (Tr. 515). He was overeating and his energy level was low. (Tr. 514). He stated that things were "very rough." (Tr. 514). He was feeling powerless. (Tr. 514). His agoraphobia was impacting his travelling in an "on/off struggle." (Tr. 514). His mental status exam indicated that his behavior was calm, his mood was down, his affect was dysphoric, he had some paranoid delusions, but his attention and concentration were "better than ever." (Tr. 514). He indicated that he was seeing his therapist on a weekly basis and was instructed to resume exercising. (Tr. 514). His Klonopin was continued and his Lexapro was increased to 15 mg per day. (Tr. 514). He was assessed a GAF of 50. (Tr. 514).

On December 8, 2010, Plaintiff followed-up in Dr. Sinderman's office. (Tr. 516, 679). Plaintiff reported that he felt his medications were helping him and that his concentration was better with Lexapro. (Tr. 516). However, Plaintiff also stated that he felt "druggy" and that he is "just here." (Tr. 516). His appetite was excessive, his energy was low, and his girlfriend was taking care of him a lot. (Tr. 516). He reported that his side effects were causing him to be sedated the first few hours of the day. (Tr. 516). He reported that he was scared of winter because the

previous winter had made him feel "trapped." (Tr. 516). He reported that he had a lot of panic attacks the previous winter. (Tr. 516). They discussed looking into using his dog as a service dog. (Tr. 516). Plaintiff was given a handout about Buspar and continued on his other medications. (Tr. 516). Plaintiff was observed to have psychomotor retardation, saddened mood, and dysphoric affect, but his insight and judgment were fair and his memory was intact. (Tr. 516). He was assessed a GAF of 50. (Tr. 516).

On December 15, 2010, Plaintiff followed-up with Dr. Rogers. (Tr. 727). He indicated that his agoraphobia was up and down, but that his girlfriend's dog was his "security blanket." (Tr. 727).

On January 6, 2011, Plaintiff followed-up with Dr. Sinderman. (Tr. 680). His affect was restricted, his insight and judgment were fair, and his attention and concentration were good. (Tr. 680). He reported passive thoughts of suicide but indicated he would "never do that." (Tr. 680). He reported some agoraphobia and indicated that he had panic attacks since his last visit, but did not report side effects from medication. (Tr. 680). Dr. Sinderman increased his Lexapro from 15 mg to 20 mg per day and continued his Klonopin. (Tr. 680).

On February 8, 2011, Plaintiff followed-up with Dr. Sinderman. (Tr. 681). Plaintiff indicated that he still had some agoraphobia. (Tr. 681). He did not report any side effects from his medications, and he was assessed a GAF of 60. (Tr. 681).

On April 6, 2011, Plaintiff followed-up in Dr. Sinderman's office. (Tr. 682). His affect was dysphoric and his insight, judgment, attention, and concentration were fair. (Tr. 682). He was reporting symptoms of anxiety, depression, panic attacks and agoraphobia. (Tr. 682). Plaintiff was advised to read a handout about Buspar and consider starting on it in the future. (Tr. 682).

On May 31, 2011, Plaintiff followed-up with Dr. Sinderman. (Tr. 684). Plaintiff reported that his mood was variable but his anxiety was "somewhat better." (Tr. 684). He indicated that he was not having any side effects from his medications, his affect was broad, his insight and judgment were fair, and his attention and concentration were good. (Tr. 684). Plaintiff was started on Buspar.[4] (Tr. 684). He was assessed a GAF of 65. (Tr. 684).

On June 27, 2011, Plaintiff reported that he was "weight lifting trying to lose weight…doing significant weight lifting…running more and was very physical as a youth." (Tr. 637). On July 11, 2011, Plaintiff reported to Dr. Sinderman that he had had a panic attack and that his medications were causing him to feel fatigued. (Tr. 685). His affect was broad, his insight was fair, his judgment was intact, and his attention and concentration was good. (Tr. 685). On July 12, 2011, Plaintiff

---

[4] *http://www.accessdata.fda.gov/drugsatfda_docs/label/2010/018731s051lbl.pdf* (last accessed January 8, 2015). Buspar is primarily used for the treatment of generalized anxiety disorder. Id. "The more commonly observed untoward events associated with the use of BuSpar not seen at an equivalent incidence among placebo-treated patients include dizziness, nausea, headache, nervousness, lighth eadedness, and excitement." Buspar has also infrequently causes "suicidal ideation." Id.

reported to Dr. Rogers that he had been working out and losing weight, but he also indicated that he had panic attack on the Fourth of July. (Tr. 719). On July 20, 2011, he reported that he was applying to community college and had been to the gym. (Tr. 718). On July 26, 2011, he reported that he felt that he was "starting to reach [his] potential" and was moving forward with applying to school. (Tr. 717).

On August 3, 2011, Plaintiff followed-up in Dr. Sinderman's office. (Tr. 686). He reported that his medications were making him feel "groggy" in the morning. (Tr. 686). He reported that he was still having panic attacks "once in a while" and his last panic attack was two days earlier and lasted for forty-five minutes. (Tr. 686). He was "hoping to go back to college." (Tr. 686). He was advised to decrease his Klonopin from .5mg to .25 mg. (Tr. 686). His insight and judgment were fair and his memory, attention, and concentration were good. (Tr. 686). Later that day, Plaintiff also saw Dr. Rogers, and indicated that his stomach was "still a problem." (Tr. 716).

On August 30, 2011, Plaintiff followed up with Dr. Sinderman. (Tr. 687). He reported that he was "going to HACC [Harrisburg Community College]" and getting "As in classes." (Tr. 687). He reported having no panic attacks, but indicated his irritable bowel syndrome was "acting up." (Tr. 687). Dr. Sinderman opined that Plaintiff was "doing well" and assessed a GAF of 70. (Tr. 687).

However, on September 27, 2011, Plaintiff was seen at Hershey Medical Center for a cold. He reported that he "used to play hockey but is unable to do this now because of back pain…gained 70 to 80 pounds last year." (Tr. 631). Plaintiff "state[d] his medications do control his anxiety and panic attacks, but he is wondering whether they are causing his [cold] symptoms." (Tr. 631). He "state[d] he feels great in terms of his anxiety…however…he feels as if he is not able to express his emotions because of his medications." (Tr. 632). Plaintiff also reported he was "in HACC [Harrisburg Community College], but is asking for an excuse right now for school as he is unable to go to school without feeling fatigued and 'sick.'" (Tr. 632). He reported fatigue, headaches, dizziness, and other symptoms. (Tr. 631). On October 10, 2011, Plaintiff reported to Dr. Sinderman that he was "[d]oing well in school, straight As." (Tr. 688). He was going to church and had gone for a run. (Tr. 690). However, he was reporting panic attacks and had an "episode" of excessive spending. (Tr. 690). Plaintiff's mood was "OK," his affect was restricted, his insight and judgment were intact, and his attention and concentration were good. (Tr. 688). He was assessed a GAF of 60. (Tr. 688).

On October 11, 2011, Plaintiff was seen at Hershey Medical Center for physical problems. (Tr. 630). He was assessed to have obesity. (Tr. 630). Notes indicated he was advised to "talk to Dr. Sinderman about the possibility that his medications are contributing to his weight gain." (Tr. 630).

On October 18, 2011, Plaintiff cancelled his appointment with Dr. Rogers due to stomach problems. (Tr. 710). He also indicated that his Dr. Sinderman wanted him to do an intensive outpatient program to monitor his medications daily but he was "not crazy about the idea." (Tr. 710). Later that day, Plaintiff's girlfriend called Dr. Rogers office "with concerns about [Plaintiff]." (Tr. 708). She was concerned that Plaintiff "quit school," was not leaving the house, had an episode where he went for a walk when he "didn't get far from their home [and] went into a full panic," was "constantly play[ing] video games," and did not want to do the "partial program that Dr. Sinderman has suggested." (Tr. 708). On October 20, 2011, Plaintiff's girlfriend called Dr. Rogers to cancel his appointment due to stomach problems. (Tr. 709).

On October 25, 2011, Plaintiff followed-up with Dr. Rogers. (Tr. 707). He indicated that his mother had concerns about his medications and that he was physically sick again. (Tr. 707). He indicated that he dropped out of school and had discussed a thirty-day partial hospitalization with Dr. Sinderman. (Tr. 707).

On November 1, 2011, Plaintiff followed-up in Dr. Sinderman's office. (Tr. 689). His affect was blunted and his insight, judgment, attention and concentration were fair. (Tr. 689). He indicated that his mood had improved on Lexapro, but that his motivation was still poor, that he felt bipolar, and had passive suicidal thoughts without a suicidal plan. (Tr. 689). He indicated that his medications were causing

him headaches and nausea. (Tr. 689). He also indicated that he was in pain, rating his pain as a five out of ten. (Tr. 689). He was offered a partial hospitalization program ("PHP"), and indicated that he would "think about it." (Tr. 689). On November 2, 2011, Dr. Sinderman contacted Dr. Rogers to express concerns with Plaintiff's medications and to recommend a partial program, Monday through Friday, from 9 a.m. to 5 p.m. (Tr. 706). He was considering switching Plaintiff from Lexapro to Effexor. (Tr. 706). Plaintiff saw Dr. Rogers later that day. (Tr. 705). He indicated that he had gained weight and felt "stuck" at home. (Tr. 705).

On November 8, 2011, Dr. Sinderman again recommended a day program for Plaintiff, but Plaintiff was hesitant and wanted to talk to Dr. Rogers first. (Tr. 704). On November 9, 2011, Plaintiff reported to Dr. Rogers that he had an intense panic attack the previous Monday. (Tr. 703). He also indicated that he had gone to church and had a positive experience there. (Tr. 703). On November 16, 2011, Plaintiff reported that his parents were taking care of him. (Tr. 702). Dr. Rogers noted that Plaintiff needed to "volunteer somewhere to use [his] mind." (Tr. 702). Plaintiff also indicated that he was adopting a new kitten and that he was anticipating returning to school in January. (Tr. 702).

On November 18, 2011, Plaintiff followed-up with Dr. Sinderman. (Tr. 690). Plaintiff's mood was better, his affect was fairly broad, his insight was fair, his judgment was intact, and his attention and concentration were good. (Tr. 690).

Dr. Sinderman initially indicated that he had a GAF of 65-67, but revised his GAF to 45, noting that he was "unable to work, go to school." (Tr. 690). He was continued on his medications. (Tr. 690).

On December 16, 2011, Plaintiff followed-up with Dr. Rogers. (Tr. 701). He indicated that he was sleeping excessively, up to twelve hours at time. (Tr. 701). He also reported that his dog keeps him grounded. (Tr. 701). He indicated that he had met with a spiritual advisor and that his faith was coming back. (Tr. 701). He also discussed relationship problems and that he would likely need to move back in with his parents. (Tr. 701).

On December 21, 2011, Plaintiff followed-up with Dr. Sinderman. (Tr. 691). Plaintiff's Buspar was discontinued and his Lexapro was increased from 20mg to 30 mg. (Tr. 691). His affect was restricted, his insight was fair, his judgment was intact, and his attention and concentration were good. (Tr. 691). He indicated that he continued to have panic attacks and was assessed a GAF of 50. (Tr. 691). On December 28, 2011, Plaintiff reported to Dr. Rogers that Dr. Sinderman wanted to take him off Lexapro, as it was clear that he was not improving, but Buspar had been discontinued by the manufacturer, so he had to increase his dose of Lexapro. (Tr. 700). He reported side effects from discontinuing Buspar and indicated that he had two panic attacks since he stopped taking Buspar. (Tr. 700). Plaintiff

questioned how he could keep from feeling "empty" and returning to "bad patterns." (Tr. 700).

On December 30, 2011, Plaintiff presented to the emergency room at Hershey Medical Center after having a panic attack and vomiting. (Tr. 730). His heart rate was 128 beats per minute and he was observed to be in moderate distress and anxious. (Tr. 731). Notes indicate Plaintiff "[e]xperienced one of his usual panic attacks but due to recent cold symptoms of nasal congestion and cough, he became more anxious and has a paroxysm of coughing. Vomited during this episode. Symptoms have improved since taking Klonopin. He is anxious also because he 'was exposed to bronchitis.'" (Tr. 732). He was discharged home in improved condition. (Tr. 732). An X-ray was normal. (Tr. 733).

On January 19, 2012, Plaintiff followed-up with Dr. Sinderman. (Tr. 743). He indicated that he had been to the emergency room on December 30, 2011, but was doing better since he had increased his dosage of Lexapro to 30 mg. (Tr. 743). He was assessed to have a GAF of 51. (Tr. 743).

On January 26, 2012, Plaintiff presented to Dr. James Herman, M.D., his primary care physician, complaining of nausea and vomiting. (Tr. 748). He was "quite obese and...difficult to move around...in a wheelchair, extremely pale, and copiously vomiting in the exam room." (Tr. 748). Plaintiff was transported to the emergency room at Hershey Medical Center "[b]ecause of the copious nature of his

vomiting and dizziness...[h]is parents did not feel that they were able to handle him in the shape that he was in and therefore an ambulance was requested." (Tr. 748). He was observed to be in mild distress and anxious, but was cooperative with appropriate mood and affect. (Tr. 752). He was diagnosed with gastroenteritis and discharged home in improved condition. (Tr. 754). On February 1, 2012, Plaintiff reported to Dr. Rogers that he had gone 48 hours without sleep. (Tr. 772).

### B. Opinion evidence

On September 13, 2010, Dr. Sinderman completed an Employability Assessment Form for the Pennsylvania Department of Public Welfare. (Tr. 519). He opined that Plaintiff was temporarily disabled from June 17, 2010 to June 17, 2011 due to generalized anxiety disorder and panic disorder with agoraphobia. (Tr. 520).

On December 14, 2010, Dr. John Gavazzi, Psy.D, reviewed Plaintiff's file. He wrote that Plaintiff "does not complain of any physical limitations" in his activities of daily living and "does not complain of pain." (Tr. 114). He wrote that Plaintiff had "no complaints of [gastrointestinal problems] to any doctor, does not see a gastrointestinal doctor and does not take medication for gastrointestinal complaints. (Tr. 114). He wrote that Plaintiff "[p]lays hockey and guitar." (Tr. 114). He wrote that Plaintiff's last visit to his primary care physician was in April of 2010 for a wrist injury from playing hockey, and that he only weighed 250

pounds. (Tr. 114). He opined that Plaintiff had mild restriction in activities of daily living, moderate restrictions in social functioning and concentration, persistence, and pace, and no episodes of decompensation. (Tr. 115). He opined that Plaintiff was moderately limited in his ability to understand, remember and carry out detailed instructions, but not short and simple instructions. (Tr. 116-17). He opined Plaintiff was not significantly limited in his ability to remember locations and work-like procedures. (Tr. 116). He opined that he was not significantly limited in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length or rest periods. (Tr. 117). He opined that Plaintiff was moderately limited in his ability to interact appropriately with the public, but was not significantly limited in his ability to interact appropriately with coworkers or peers without exhibiting behavioral extremes, accept instructions and respond appropriately to criticism from supervisors, maintain socially acceptable behaviors and adhere to basic standards of neatness and cleanliness. (Tr. 117). He noted that Plaintiff has not had "any

hospitalizations because of his mental impairments" and has "improved with treatment." (Tr. 118). He rejected Dr. Sinderman's September opinion because it was on an issue reserved to the Commissioner. (Tr. 118).

On December 28, 2011, Dr. Rogers submitted an opinion letter. (Tr. 692). He explained that Plaintiff had initially presented in November of 2007 with symptoms of panic disorder, present since adolescence, and a family history of bipolar disorder. (Tr. 692). He notes that "[f]rom the time of the initial intake until June 2010, the patient's condition appeared relatively responsive" to his treatments. (Tr. 692). He continues, "[i]t was becoming increasingly apparent, however, by early 2010, the pattern of symptoms was creating increased difficulty in [Plaintiff's] attendance at work so that by June, he was dismissed from his job." (Tr. 692). Since then, Plaintiff's:

> [C]ondition has been difficult to stabilize. He has worked closely with his psychiatrist, Dr. Stephen Sinderman...to find a workable pyschopharmacological regimen that would contain the panic symptoms without exacerbating side effect [primarily gastrointestinal in nature) that often would be equally limiting and debilitating. As recently as the past month, [Plaintiff] and Dr. Sinderman have attempted to modify his medications to contain the panic symptoms…Over the past eighteen (18) months Robert has demonstrated some periods of progress and stabilization/consolidation but circumstantial stressors often triggered regression and return to baseline.
>
> Needless to say, Mr. Hennion's inability to function at a level to make consistent employment possible has contributed to an intensification of stressors (particularly financial) that have become part of a vicious cycle…

> I have continued to provide periodic consultations to Robert at a near pro-bono level ($20/consult) given his financial constraints. Generally speaking, the supportive interventions combined with cognitive-behavioral elements have sought to provide [Plaintiff] with the necessary cognitive frameworks and skill sets to help him cope and deal with the panic disorder.

(Tr. 692).

On December 28, 2011, Dr. Rogers also completed a Mental Impairment Questionnaire. (Tr. 694). He indicated that he treated Plaintiff intermittently since 2007, more consistently since January of 2010. (Tr. 694). He diagnosed Plaintiff with panic disorder and assessed him to have a GAF of 45. He explained that Plaintiff "has had mixed responses to the supportive and cognitive-behavioral treatments/psychotherapy since January 2010...inconsistent/ unpredictable/ idiosyncratic responses." (Tr. 694). He noted that Plaintiff has "reported an array of physical reactions/side effects/unintended responses" to his medication. (Tr. 694). He explained that Plaintiff "has been able to demonstrate periods of unsustained progress followed by regression/retrogression to baseline with regard to the panic symptoms." (Tr. 694).

He opined that Plaintiff was "[s]eriously limited, but not precluded" in remembering work-like procedures, carrying out very short and simple instructions, maintaining attention for two hour segments, making simple work-related decisions, asking simple questions or requesting assistance, getting along with co-workers or peers without unduly distracting them or exhibiting behavior

extremes, being aware of normal hazards and taking appropriate precautions, understanding, remembering, and carrying out detailed instructions, setting realistic goals or making plans independently of others, dealing with the stress of semiskilled and skilled work, adhering to basic standards of neatness and cleanliness, and using public transportation. (Tr. 696-97). He opined that Plaintiff was "unable to meet competitive standards" in maintaining regular attendance and being punctual within customary, usually strict tolerances, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to changes in a routine work setting, dealing with normal stress, and traveling to unfamiliar places. (Tr. 696-97). He explained that "during initial course of counseling [Plaintiff] was gainfully employed. He was erratic and inconsistent in his ability to maintain attendance [at] work...consequently, he was dismissed." (Tr. 696). He opined that Plaintiff had marked restrictions of activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace, and had four or more episodes of decompensation. (Tr. 698). He indicated that Plaintiff has "episodes" every six to

eight weeks and is only able to maintain functioning for up to eight weeks before regressing. (Tr. 698). He opined Plaintiff would miss work more than four days per month. (Tr. 699).

On January 3, 2012, Dr. Sinderman completed a Mental Impairment Questionnaire. (Tr. 735). He indicated that he had seen Plaintiff every two to eight weeks since August of 2007. (Tr. 735). He diagnosed Plaintiff with generalized anxiety disorder and panic disorder with agoraphobia and assessed him to have a GAF of 45. (Tr. 735). He opined that Plaintiff's panic attacks and agoraphobia restrict his ability to "go places and leave the house." (Tr. 735). He opined that Plaintiff's prognosis was guarded. (Tr. 735).  He indicated that Plaintiff's mental impairments caused "appetite disturbance with weight change," decreased energy, generalized persistent anxiety, difficulty thinking or concentrating, apprehensive expectation, easy distractibility, autonomic hyperactivity, "recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week," and "persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity or situation." (Tr. 736-37). He explained that Plaintiff's "[s]ymptoms would interrupt a normal workday and cause distractibility. He has limited ability to adapt to change in the workplace and adapt to regular at work pressure." (Tr. 737).

He opined that Plaintiff was "seriously limited, but not precluded" from making simple work-related decisions, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and carrying out detailed instructions. (Tr. 737-38). He opined that Plaintiff was "unable to meet competitive standards" in working in coordination with or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, responding appropriately to changes in a routine work setting, dealing with normal work stress, dealing with the stress of semiskilled and skilled work, and interacting appropriately with the general public. (Tr. 737-38). He opined that Plaintiff had "no useful ability to function" in traveling in unfamiliar places and using public transportation. (Tr. 738). He opined that Plaintiff had moderate restriction in activities of daily living, marked limitation in maintaining social functioning and concentration, persistence, and pace, and had experienced one or two episodes of decompensation. (Tr. 739).

## C. Function Report, testimony, and ALJ findings

In November of 2010, Plaintiff and his mother submitted Function Reports. (Tr. 238, 260).  Plaintiff indicated that he was had problems going out in public and in social situations, could not go to public sporting events or mountains, and

was suffering from panic attacks and agoraphobia. (Tr. 242-43). Plaintiff was living alone, but indicated that he only prepares meals "occasionally and "most often" eats at his mother's.(Tr. 240).  His mother confirmed that he only cooks infrequently and cannot prepare meals due to sedation and mood swings. (Tr. 262). He wrote that "complete meals are tough to cook due to sedation sometimes" and that he sometimes forgets to eat. (Tr. 240).  He reported problems using the toilet due to his irritable bowel syndrome and difficulty sleeping. (Tr. 239).

Plaintiff reported that he was able to play video games with a friend and go to the bank, stores, and the humane society. (Tr. 242). He indicated that he "sometimes" goes out alone but that he cannot drive more than thirty minutes due to panic attacks. (Tr. 241). When asked if there had been changes in his activities since his illness began, he indicated that he had "not been to the gym since before June" and could not go "hiking or running outside due to agoraphobia." (Tr. 242). He indicated that he could walk, but only up to ten minutes before he gets scared and runs home. (Tr. 243). His mother indicated that his walks "could be as brief as 5 minutes due to his agoraphobia." (Tr. 265). Both reported that Plaintiff's mother and girlfriend helped care for his cats by paying for cat food and taking them to veterinary visits. (Tr. 239, 261). Plaintiff's mother also indicated that she frequently buys his groceries for him. (Tr. 263). He indicated that he could pay bills and use a checking account, but also indicated that he "sometimes

compulsively spend[s] money to eliminate depression." (Tr. 242). His mother concurred, noting that he "compulsively spends on home entertainment to make himself feel better." (Tr. 264). Plaintiff's mother indicates that he only reads "sporadically when his energy permits." (Tr. 264).

By December of 2011, Plaintiff was reporting even more limited activities. Plaintiff indicated that he was only doing his household chores "when able," and that his mother or girlfriend helps at times. (Tr. 277). He indicated that he only went outside the house one time per month and that he needed someone with him or he "could have a panic attack or lose control of [his] thoughts." (Tr. 277). When asked if he cooks, he indicated "I don't anymore." (Tr. 278). He wrote that his mother or girlfriend "make what's need or [he] microwave[s] soup." (Tr. 278). He did indicated that his hobbies include reading, studying german, history, computer technology, taking walks with his dog, video games, and playing guitar, but only "when [he has] the energy." (Tr. 278). He indicated that he only "rarely" sees friends and that he had gained too much weight to play sports. (Tr. 279).

On January 31, 2012, Plaintiff appeared and testified at a hearing before an ALJ. (Tr. 83). He testified that he was living in an apartment with his girlfriend. (Tr. 85). He testified that his highest education completed was twelfth grade and that he had received no vocational training. (Tr. 86). Plaintiff testified that he stopped working in June of 2010 when he started having panic attacks at work and

his medication "side effects were so bad that I was told that I couldn't go to work by Dr. Sinderman." (Tr. 92). He explained that he was "practically salesman of the year…making the most money [he] ever had in [his] life" and was "liv[ing] a pretty happy life" at the time, but it "just took on a mind of its own" and his "panic attacks grew into agoraphobia," so that he could not take walks past a certain point because he "got scared of the sky and how big it was." (Tr. 92). He testified that being in a closed office "really scares" him and triggers panic attacks. (Tr. 92). He testified that he continued to have panic attacks two to three times per week since he stopped working. (Tr. 93).

He testified that he naps for two to three hours during the day. (Tr. 89). He testified that his medications were "the best ones [he's] ever been on but they're still nowhere near perfect" that that he had been in the emergency room twice in the last thirty days due to side effects. (Tr. 90). He testified that he stopped taking Buspar in December, which caused a panic attack and emergency room visit. (Tr. 90). Then, he increased his Lexapro and Klonopin, which caused him to vomit uncontrollably. (Tr. 90). He testified that he takes his medications at night, so that he feels "hungover" for the first few hours after he wakes up and needs to go to the bathroom three to five times in the same period. (Tr. 95). He explained that Dr. Sinderman is "constantly" adjusting his medications to address his side effects and underlying symptoms. (Tr. 95).

He testified that he generally wears the same clothes for a "few days" because he does not leave the house much. (Tr. 86). He testified that his "girlfriend does most of the cooking" and that the only thing he "can really do…is microwave." (Tr. 87). He explained that his medications would cause him to leave things on the stove unattended. (Tr. 87). He testified that he goes grocery shopping "when [his] girlfriend can go with [him]" and that she does all the dishes. (Tr. 87). He testified that he does his laundry and takes out the trash, and that he only vacuums and sweeps "sporadically..the last time that happened probably was a month and a half ago." (Tr. 87).  He explained that he "really [does not] do any chores." (Tr. 100).

He testified that he reads, plays video games, and watches football at his parent's apartment, and that he "used to love to go to concerts and hockey games…used to play hockey" but is no longer able to do so. (Tr. 88). He testified that he could not go see his brother in New York City because he cannot use public transportation and because he had a panic attack there in 2007. (Tr. 89). He testified that he does not go the movies or dinner with his girlfriend because he "couldn't even stay" the last time he went to a movie because he "escaped reality" and was "terrified of the size of the screen and being trapped in that room." (Tr. 89). He explained that the "med center is right out where [he] lives." (Tr. 97). He

testified that he used to run seven or eight miles every morning, but could not go around the track anymore because he was terrified. (Tr. 97).

He explained that he lost all of his friends because he no longer hung out with them, and that he only socialized with his girlfriend. (Tr. 97). He explained that he felt comfortable going to his doctor's office, his parent's house, the medical center when they sedate him enough, and could go on a "small shopping errand" to Giant or Best Buy if his dog or girlfriend were with him. (Tr. 98). He testified that he had not done these activities alone since October 2011. (Tr. 98). He testified he could go the Turkey Hill with was "right in my apartment complex near [his] mom's." (Tr. 100).  He testified that he was trying to get his dog trained to sense when he was going to have a panic attack. (Tr. 99).  He testified that his parents pay his bills and that his mother handles the payments. (Tr. 102). He testified that his parents brought him to the hearing that day. (Tr. 103).

A vocational expert ("VE") also appeared and testified. (Tr. 103). The VE testified that, given the RFC assessed by the ALJ described below, Plaintiff could perform work as an industrial cleaner and a machine feeder. (Tr. 103-105). The VE testified that if Plaintiff would be absent more than once per month or off task more than 20 percent of the time, there would be no work he could perform in the national economy. (Tr. 106).

On March 9, 2012, the ALJ issued his decision. (Tr. 66). At step one, he found that Plaintiff had not engaged in substantial gainful activity since June 17, 2010, the alleged onset date. (Tr. 68). At step two, the ALJ found that Plaintiff's anxiety/panic disorder with agoraphobia was medically determinable and severe. (Tr. 68). At step three, the ALJ found that Plaintiff's impairment did not meet or equal a Listing. (Tr. 69-70). The ALJ found that Plaintiff had the RFC to perform medium work, limited to simple routine repetitive tasks in a work environment free from fast paced production involving only simple work-related decisions with few, if any, workplace changes and work that is isolated with only occasional supervision. (Tr. 71). At step four, the ALJ found that Plaintiff could not engage in any past relevant work. (Tr. 75). However, at step five, the ALJ found that Plaintiff could engage in other work in the national economy, pursuant to the vocational expert's testimony. (Tr. 75). Consequently, the ALJ determined that Plaintiff was not disabled and not entitled to benefits. (Tr. 76).

## VI. Plaintiff Allegations of Error

### A. The ALJ's assignment of weight to the medical opinions

The ALJ assigned great weight the December 14, 2010 opinion of Dr. Gavazzi, a non-examining, non-treating state agency physician, and rejected most of the January 2012 opinions of Dr. Sinderman and Dr. Rogers. In rejecting Dr. Sinderman and Dr. Rogers' opinions, he wrote only that they were "not supported

by the medical evidence of record." (Tr. 73-74). The Court notes that, at the time of each opinion, both doctors had been treating Plaintiff regularly for more than four years, and had been in frequent contact and coordination with each other regarding his care. (Tr. 508-09, 694, 721-22, 735).

The Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight. 20 C.F.R. § 416.927(d)(2). 20 C.F.R. §404.1527(c) establishes the factors to be considered by the ALJ when the opinion of a treating physician is not given controlling weight. Under 20 C.F.R. §§404.1527(c)(1) and (2), the opinions of treating physicians are given greater weight than opinions of non-treating physicians and opinions of examining physicians are given greater weight than opinions of non-examining physicians. 20 C.F.R. §404.1527(c)(2) also differentiates among treating relationships based on the length of the treating relationship and the nature and extent of the treating relationship. 20 C.F.R. §404.1527(c)(4) states that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. §404.1527(c)(5) provides more weight to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

In *Morales v. Apfel*, 225 F.3d 310  (3d Cir. 2000), the Court of Appeals for the Third Circuit set forth the standard for evaluating the opinion of a physician stating that:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer [v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999)] (quoting  *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir.1994); *Jones*, 954 F.2d at 128; *Allen v. Bowen*, 881 F.2d 37, 40-41 (3d Cir.1989); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Brewster*, 786 F.2d at 585.   Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason."  *Plummer*, 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)).   The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled.  See *Adorno*, 40 F.3d at 48.   In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.  *Plummer*, 186 F.3d at 429; *Frankenfield v.  Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent*, 710 F.2d at 115.

*Id.* at 317-318. "[A]n ALJ is not free to set his [or her] own expertise against that of a physician who presents competent evidence." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). An ALJ impermissibly substitutes his "own judgment for that of a physician" when he independently reviews and interprets the objective medical evidence. *Id.*

As an initial matter, the Court has no way to evaluate why the ALJ failed to credit certain portions of Dr. Sinderman's opinion. The ALJ wrote that the portion of Dr. Sinderman's opinion indicating that Plaintiff was "unable to work secondary to anxiety with panic and agoraphobia" and that his "symptoms would prevent a normal workday" was "supportive of the finding that the claimant's impairments are severe" and was "based upon a personal examination of the claimant, is within he source's area of expertise, and is generally consistent with and supported by the record as a whole." (Tr. 73). The ALJ did not provide any other analysis of these limitations. However, the ALJ did not include a limitation that Plaintiff was unable to work or unable to complete a normal workday in the RFC.  In other words, the ALJ rejected these limitations without providing a rationale for doing so.

Similarly, the ALJ wrote that the portion of Dr. Rogers opinion that "claimant is not able to be consistent nor sustained over the course of day, week, or weeks in his pattern of memory, attention, motivation, or freedom from detractability [sic]," that "his condition is complicated by the presence of panic episodes and consequential debilitating symptoms," that "claimant's adverse reactions to medications also hinders his function," that "an integral feature of the claimant's panic disorder has been manifested in his periodic  and episodic constrictions and emotionally imposed restrictions on his ability to travel to semi or unfamiliar places," that his "behavioral reactivity and impulsivity…results in

social and occupational difficulties" was "supportive of the finding that claimant's impairments are severe" and is "based on a personal examination of the claimant, is within the source's area of expertise, and is generally consistent with and supported by the record as a whole." (Tr. 73-74). The ALJ did not provide any other analysis of these limitations.  However, the ALJ did not include a limitation that Plaintiff could not sustain work over the course of days or weeks, did not include a limitation related to panic episodes that would cause him to miss work, did not include a restriction on travel to "semi or unfamiliar places," and did not include any limitations regarding his side effects. (Tr. 73).

Thus, the ALJ also rejected these limitations without providing a rationale for doing so. In fact, for both of these opinions, the ALJ indicated that they were based on a longitudinal treatment relationship and consistent with the record as a whole. (Tr. 73-74). The Court cannot engage in meaningful review when the ALJ fails to explain why evidence that contradicts his conclusion was rejected. *Burnett v. Comm'r of Soc. Sec. Admin.,* 220 F.3d 112, 121 (3d Cir.2000) ("Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence…In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.") (internal citations omitted).

With regard to the portions the ALJ did reject, Plaintiff asserts that the ALJ's generic assertion that the treating source opinions were "not supported by the medical evidence of record" is inadequate to reject them. (Pl. Brief at 10). The Third Circuit has held that an ALJ may not generically reject a treating physician's opinion on the ground that "clinical evidence does not warrant a finding of disability" without "point[ing] to some other evidence contradicting [the opinion]" because "disability may be 'medically determined' for purposes of the Act even when a doctor's opinion is not supported by objective clinical findings." *Rossi v. Califano*, 602 F.2d 55, 58 (3d Cir. 1979) (citing *Stark v. Weinberger*, 497 F.2d 1092 (7th Cir. 1974); *Branham v. Gardner*, 383 F.2d 614 (6th Cir. 1967)). Moreover, "the ALJ must make clear on the record his reasons for rejecting the opinion of the treating physician." *Brewster v. Heckler*, 786 F.2d 581, 585-86 (3d Cir. 1986); 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Thus, the ALJ's rationale lacked the requisite specificity to reject a treating physician opinion. *Ray v. Colvin*, 1:13-CV-0073, 2014 WL 1371585, at *21 (M.D. Pa. Apr. 8, 2014) ("The cursory manner in which the ALJ rejected Dr. Jacob's opinions runs afoul of the regulation's requirement to "give good reasons" for not crediting the opinion of a treating source upon consideration of the factors listed above.").

Defendant argues that the rationales from the ALJ's credibility assessment, namely Plaintiff's treatment, mental abnormalities, and activities of daily living, provide sufficient justifications. (Def. Brief at 20). A credibility assessment may not be used to reject a treating physician's opinion. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). However, because a Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," the Court will address the additional rationales. *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.,* 730 F.3d 291, 305 (3d Cir. 2013).

The ALJ wrote that the medical evidence demonstrated that Plaintiff had no "significant mental abnormality." (Tr. 75). If this were an accurate and permissible conclusion, this would provide substantial evidence to reject the treating source opinions because it would show that the opinions were not consistent with the record as a whole. 20 C.F.R. §404.1527(c)(4). However, this is not an accurate conclusion because, in discussing the medical evidence, the ALJ fails to acknowledge most, if not all, of the abnormalities documented in the record. This is also not a permissible conclusion, because the only doctors who reviewed most of the significant medical evidence (Dr. Rogers and Dr. Sinderman) concluded that Plaintiff had significant mental abnormalities. Consequently, the ALJ had to independently interpret the medical evidence to conclude that there were no

significant mental abnormalities, which is an impermissible lay interpretation of medical evidence.

In examining the medical evidence during the relevant period, the ALJ writes only that Plaintiff "typically presented upon examination with appropriate appearance, speech, thought process, and hygiene, indicative of appropriate [activities of daily living] (Exhibits 3F, 9F)", he "shops at the store and is polite and cooperative (Exhibits 4E, 3F, 9F, Testimony)," and he "typically presents as neutral in mood, alert and oriented, cooperative, normal speech, intact orientation, with fair insight and memory (Exhibit 3F)." (Tr. 69-74).

First, Third Circuit precedent precludes an ALJ from concluding that Plaintiff's ability to function at a doctor's office, where he feels comfortable, means that he can function in a work environment:

> Dr. Erro's observations that Morales is "stable and well controlled with medication" during treatment does not support the medical conclusion that Morales can return to work. Dr. Erro, despite his notation, opined that Morales's mental impairment rendered him markedly limited in a number of relevant work-related activities. Other information in the treatment records supports this opinion. Thus, Dr. Erro's opinion that Morales's ability to function is seriously impaired or nonexistent in every area related to work shall not be supplanted by an inference gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting.

*Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000).

Second, it appears that the ALJ is citing from a portion of the form for Dr. Sinderman's progress notes that asks for observations regarding appearance,

behavior, mood, speech, affect, thought process, orientation, delusions, insight, judgment, memory, and attention and concentration. (Tr. 510). However, the ALJ only acknowledged the categories of this form that were typically normal, such as speech and hygiene. The ALJ never mentions the "affect" category, which was generally abnormal. In June of 2010, Plaintiff's affect was anxious. (Tr. 504). In September of 2010, October of 2010, January of 2011, October of 2011, and December of 2011, Plaintiff's affect was restricted or "very restricted." (Tr. 510, 512, 680, 688, 691). In November of 2010, December of 2010, February of 2011, his affect was dysphoric. (Tr. 514, 516, 682). In November of 2011, his affect was blunted. (Tr. 689). The ALJ never acknowledges the abnormalities in the "delusions" category, as Plaintiff had paranoid delusions in October and November of 2010. (Tr. 512, 514). The ALJ also never acknowledges the abnormalities in the behavior category, as Plaintiff had psychomotor retardation in October and December of 2010. (Tr. 512, 516).

The ALJ does not accurately characterize the "mood" category. The ALJ wrote that Plaintiff's mood was "typically" neutral, but the only time his mood was noted to be neutral was in November 2009, well before the alleged onset date, by a resident in Dr. Sinderman's office (not Dr. Sinderman). (Tr. 498). In fact, during the relevant period, Plaintiff's mood was frequently depressed, anxious, or variable. (Tr. 505, 514, 516, 684). Moreover, Plaintiff admitted to having suicidal

thoughts on multiple occasions. (Tr. 680, 689).[5] Although an ALJ is not required to cite every piece of evidence, an ALJ may not cite only the portions of the medical records that support his conclusion without acknowledging the portions of the records that undermine his conclusion. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir.2000). Thus, because the ALJ failed to accurately characterize the record, his lay opinion that the records showed no "significant mental abnormalities" does not provide substantial evidence to reject the treating physician's opinions.

Third, the ALJ was not entitled to independently interpret the medical evidence to conclude that it demonstrated no "significant" abnormalities. The ALJ has no medical training and is not competent to determine when abnormalities are "significant." Plaintiff points out that the state agency opinion was rendered more than a year before the ALJ decision, so the state agency physician was unable to review most of the relevant medical records. (Pl. Brief at 10). Defendant argues that the passage of time between Dr. Gavazzi's opinion and the ALJ decision is "inconsequential." (Def. Brief at 17) (citing *Chandler v. Commr. of Soc. Sec.*, 667 F.3d 356 (3d Cir. 2011). Plaintiff replies that passage of time is only irrelevant pursuant to *Chandler* when there is no later evidence that undermines the agency

---

[5] The ALJ also does not acknowledge that Plaintiff repeatedly reported frequent panic attacks and side effects of medication.

physician's opinion. Plaintiff contends that, here, later evidence undermines the opinion, so *Chandler* does not apply. (Pl. Reply at 3).

Although an ALJ is entitled to rely on a state agency opinion in appropriate circumstances, despite the passage of time, that does not mean that the passage of time is "inconsequential." In *Chandler*, it was appropriate to rely on the state agency opinion because evidence submitted subsequent to the opinion supported the state agency conclusions. The Court explained that:

> The new medical evidence generated after Dr. Popat's review did not undermine his conclusion. Chandler's September 2008 Progress Note says: "[H]er foot pain has improved. They gave her a new antenna for her spinal cord stimulator and things have improved.... She really feels comfortable with her medications at this time and does not want to change anything.... She has stopped smoking marijuana." Just before the ALJ hearing, in May 2009, Chandler's fentanyl patch was "tak[ing] the edge off," and "she [was] able to do her activities of daily living." Chandler was experiencing some new hand pain but was able to "use a computer frequently."

*Chandler*, 667 F.3d at 363. Thus, the ALJ was not required to independently interpret the medical records because they specifically stated that Plaintiff had improved, felt comfortable, and was performing activities of daily living.

Here, however, as discussed above, the evidence submitted subsequent to the state agency opinion contained multiple objective mental abnormalities. In addition to the mental impairments, the state agency opinion was rendered when Plaintiff weighed only 250 pounds, and had not yet experienced his 100 pound weight gain since his symptoms increased and he was started on Lexapro and

Buspar.[6] They also reference limitations in Plaintiff's activities of daily living. In other words, the passage of time after the state agency physician rendered his opinion is relevant in this case not only to the assignment of weight to the state agency opinion, but also to whether the ALJ was required to undergo impermissible lay interpretation of medical evidence in assigning weight to the treating physicians' opinions. Because no individual with medical training concluded that the records containing substantially increased abnormalities were not "significant," the ALJ was not entitled to conclude that they were not significant.

The Court notes that most of the relevant records were handwritten notes from Dr. Rogers and Dr. Sinderman. Much of these notes were illegible. Defendant concedes that "[b]oth of Plaintiff's treating physicians' notes are difficult to read." (Def. Brief at 6). However, that does not excuse the ALJ's failure to acknowledge the abnormalities that were documented legibly. Moreover, to the extent the ALJ was unable to read these records, the ALJ should have obtained clarification of those records, as they were crucial to the determination of disability. An ALJ is not entitled to characterize the medical record as evidencing no "significant mental

---

[6] Although the record contains multiple references to functional limitations caused by Plaintiff's obesity, and the ALJ never evaluated whether Plaintiff's obesity affected his ability to work, Plaintiff has not raised the ALJ's evaluation of his obesity as an error.

abnormalities" simply because he is unable to decipher what the records say. As

another District Court has explained:

> Illegibility, however, is not a proper basis to disregard relevant medical evidence. *Rodriguez v. Astrue,* 2012 WL 5494659, at *7 n. 11 (E.D.Pa. April 2, 2012) ("[I]llegibility would not be a sufficient reason for ignoring relevant evidence."). Several courts in this District have, accordingly, found reversible error where the ALJ disregarded treatment notes on the basis of their illegibility. *Debias v. Astrue,* No. 11–3545, 2012 WL 2120451, at *7 (E.D.Pa. June 12, 2012); *Berrios–Vasquez v. Massanari,* No. 00–2713, 2001 WL 868666, at *6 (E.D.Pa. May 10, 2001); *see also Ellow v. Astrue,* No. 11–7158, 2013 WL 159919, at *7 (E.D.Pa. Jan.15, 2013) (holding that doctor's purportedly illegible notes did not justify a remand because "the ALJ did not have any obvious difficulty reading" them).
>
> Also troubling is the fact that the ALJ's decision to give little weight to Yarus's RFC assessment was based, in part, on the ALJ's assertion that there was "nothing in Dr. Yarus's treatment notes" that supported Yarus's assessment. A.R. at 28. While it is conceivable that the ALJ obtained a legible copy of the notes prior to issuing her opinion, there is nothing in the record to indicate that this was the case. Without a legible copy of Yarus's treatment notes, it was improper for the ALJ to assert that "nothing" in the notes supported Yarus's RFC assessment. *See Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir.2000) ("[I]f the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason *or for the wrong reason.*" (emphasis added)).

*Grice v. Astrue*, CIV.A. 12-3502, 2013 WL 2062263, at *3 (E.D. Pa. May 15,

2013); *see also Bishop v. Sullivan*, 900 F.2d 1259, 1262 (8th Cir. 1990) ("The

medical evidence of record submitted prior to the hearing consists of 65 pages, 26

of which are illegible because of poor copy quality or handwriting. The medical

evidence submitted to the Appeals Council after the issuance of the ALJ's decision

comprises an additional 99 pages, 39 of which are illegible for the same reasons.

This court has held that illegibility of important evidentiary material can warrant a remand for clarification and supplementation…. In view of the illegibility of the supplemental evidence submitted after the hearing, we question the Appeals Council's conclusion that these reports contained essentially the same information as the previously submitted evidence.") (internal citations omitted); *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975) ("Many of the medical records included in the case are illegible, either because of the poor quality of the reproduction, the handwriting of the physician, or both. Under the circumstances this court has no way to determine whether the Secretary fully understood some of the medical reports before him. Where the medical records are crucial to the plaintiff's claim, illegibility of important evidentiary material has been held to warrant a remand for clarification and supplementation.").

The ALJ also concluded that Plaintiff's medical records showed "routine and extremely conservative" treatment because he "had no treatment of his alleged mental disorder beyond a course of outpatient treatment, during which time the record reveals that the claimant failed to follow-up on recommendations made by claimant's treating doctor or to participate in a partial program and intensive outpatient program, which suggests that the symptoms may not have been as serious as has been alleged" and Plaintiff "has not undergone…any other increase

in outpatient psychiatric, psychological, therapeutic, or pharmacological treatment indicative of a more serious psychiatric impairment." (Tr. 70).

In assessing credibility, the ALJ may rely on Plaintiff's course of treatment. SSR 96-7p. However, the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Id.   Here, the record indicated that Plaintiff's finances may have caused him to limit his treatment. (Tr. 692).   Moreover, Plaintiff's reluctance to participate in a partial hospitalization program may have been a symptom of his agoraphobia, not a sign that his agoraphobia was less limiting:

> We note that several courts have questioned the relevance of infrequent medical visits in determining when or whether a claimant is disabled. For example, the Court of Appeals for the Ninth Circuit has held that the fact that a "claimant may be one of the millions of people who did not seek treatment for a mental disorder until late in the day" was not a substantial basis to reject that an impairment existed. *Nguyen v. Chater,* 100 F.3d 1462, 1465 (9th Cir.1996).

*Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 547 (3d Cir. 2003) (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) ("[T]hose afflicted often do not recognize that their condition reflects a potentially serious mental illness…"[a]ppellant may have failed to seek psychiatric treatment for his mental

condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.") (internal citations omitted). Thus, because the ALJ did not address the possible reasons for Plaintiff's allegedly conservative treatment, he was not entitled to rely on the conservative treatment to reject Plaintiff's claims or his doctors' opinions.

Moreover, the ALJ again mischaracterized the record. The ALJ wrote that Plaintiff "has not undergone…any [increase in] psychological, therapeutic, or pharmacological treatment." (Tr. 70). However, the record reflects frequent increases in psychological and pharmacological treatment. (Tr. 497, 504, 512, 514, 659, 680, 691).   Similarly, the ALJ never acknowledges any of Plaintiff's emergency treatment at Hershey Medical Center. This treatment corroborates Plaintiff's claims and his physicians' opinions. For instance, the emergency department records show that Plaintiff presented to the emergency room on December 30, 2011 after a panic attack, with a heart rate of 128 beats per minute and he was observed to be in moderate distress and anxious. (Tr. 731).

Even if he had not mischaracterized the record, it is questionable whether a reasonable mind could have concluded that Plaintiff's treatment was conservative without basing this conclusion on a medical opinion. An informative case is *Shields v. Astrue*, 3:CV-07-417, 2008 WL 4186951 (M.D. Pa. Sept. 8, 2008), where the District Court rejected a magistrate judge's recommendation that the

Commissioner's denial of disability benefits be affirmed. There, like here, the ALJ

rejected the claimant's credibility based on her allegedly conservative treatment.

The District Court disagreed that Plaintiff's treatment was conservative, explaining

that she received:

> [O]ngoing and protracted treatment for her pain, including several sessions
> of acupuncture, (R. 167-75), an unsuccessful spinal injection, (R. 163), and
> increasingly strong pain medication, (R. 68, 73, 86, 88, 91, 109, 201-04,
> 221, 223, 225). And while the ALJ attached significance to the fact that
> Plaintiff took "pain medication only on an as needed basis," he failed to
> mention the fact that "as needed" meant use two to three times each day of a
> synthetic morphine (Avinza), Zanaflex, and Vicodin.

*Shields*, 2008 WL 4186951 at *11. Here, like the claimant in *Shields*, Plaintiff was

treated with increasingly strong medication with substantial side effects two to

three times a day. The ALJ never mentioned the frequency or extent of Plaintiff's

medication, or the frequency of his visits with Dr. Rogers and Dr. Sinderman.

Without mentioning Plaintiff's frequent treatment increases or exploring an

explanation for his supposedly conservative treatment, the ALJ was not entitled to

rely on conservative treatment to reject the physicians' opinions.

Finally, the ALJ wrote that Plaintiff "admittedly retains the ability to

independently and adequately attend to his personal care or that of his pets, prepare

meals, complete household tasks, drive a car, go shopping, use a computer, count

change, pay bills, use a checking account, play hockey, go to church, browse a

bookstore, and read books, study German, history, politics, computer technology,

play the guitar, discuss current social issues with family and friends, and discuss life with his priest." (Tr. 75).

First, this is also a mischaracterization of the record. Plaintiff never indicated that he could "independently care" for his cats; both he and his mother indicated that he needed the help of his mother and girlfriend to care for them. (Tr. 239, 261).   He indicated in November of 2010 that he could "occasionally" prepare meals, but ate most meals at his mother's house, and by December of 2011 he was not cooking at all. (Tr. 240, 262, 277). He could complete some household tasks, but also indicated that his girlfriend did most of the chores and that he needed encouragement and assistance to complete them. (Tr. 244, 277).   *Schaffold v. Astrue*, No. 2:10CV116, 2011 WL 94208, at *16 (W.D. Pa. Jan. 11, 2011) (It is improper to put "significant weight on the fact that Plaintiff admitted to being functional periodically" when the claimant "prefaced all his reports about his abilities with the qualification that all such activities were dependent" on his condition and limitations). He indicated that he could drive a car and go shopping, but only if someone was with him. (Tr. 277).   He repeatedly indicated that he had not been able to play hockey since before the onset date. (Tr. 631).   He indicated that he could pay bills, but both the Function Reports and medical records indicated that he has episodes where he spends money compulsively. (Tr. 242, 264, 569).   Again, the ALJ was citing only to the evidence that supported his claims,

while failing to acknowledge evidence of Plaintiff's daily activities that undermined his claims.

Second, none of these activities suggest that Plaintiff can engage in work on a regular, continuous schedule. "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity. Smith's activities are miniscule when compared to a plethora of cases which have held that there was total disability even when the claimant was far more active than Smith. It is well established that sporadic or transitory activity does not disprove disability." *Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981). This is because household tasks are less stressful and allow flexibility for breaks. *Harsh v. Colvin*, No. 3:13-CV-42 GLS, 2014 WL 4199234, at *4 (N.D.N.Y. Aug. 22, 2014) ("[T]he ALJ placed undue emphasis on Harsh's ability to perform a "wide range of daily activities," including doing some cooking, cleaning, laundry, and shopping, sitting on her porch, reading, and caring for her kids. (Tr. at 13, 43–44, 284.) Under the circumstances and given the medical opinions of record, it was error for the ALJ to infer an ability to handle the stress demands of competitive, remunerative employment on a sustained basis from the ability to perform very basic activities of daily living."); *Draper v. Barnhart*, 425 F.3d 1127, 1131 (8th Cir. 2005) ("[T]he test is whether the claimant has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which

real people work in the real world.' In other words, evidence of performing general housework does not preclude a finding of disability.") (internal quotations omitted); *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir.2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons ... and is not held to a minimum standard of performance, as [ ]he would be by an employer."). Thus, these activities do not contradict his physicians' opinions that he would struggle with the competitive requirements of a regular work setting and do not provide substantial evidence to reject the physicians' opinions.

## VII.    Conclusion

In sum, if the ALJ had properly relied on a lack of mental abnormalities, conservative treatment, and activities of daily living, he would have had substantial evidence to reject the physicians' opinions. However, he was not entitled to rely on a lack of mental abnormalities because he failed to mention all of the mental abnormalities demonstrated in the medical records and independently interpreted the records, constituting impermissible lay opinion. He was not entitled to rely on Plaintiff's conservative treatment because he did not address the explanations for his supposed conservative treatment and made factual errors in characterizing his treatment. He was not entitled to rely on the activities of daily living because he

made factual errors in characterizing Plaintiff's admitted abilities and failed to identify any activity that was not sporadic and transitory. Because the ALJ erred in evaluating the opinions, the Court cannot tell whether the ALJ properly analyzed the Listings at step three or the RFC. Accordingly, the undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1. The decision of the Commissioner of Social Security denying Plaintiff's social security disability insurance and supplemental security income benefits be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, obtain legible treatment notes if necessary, and conduct a new administrative hearing and appropriately evaluate the evidence, particularly Plaintiff's treating source opinions.

2. The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the

report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: January 14, 2015                          s/Gerald B. Cohn
                                          GERALD B. COHN
                                   UNITED STATES MAGISTRATE JUDGE